

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

MAYDA ALVAREZ,

                    Plaintiff,

                                            **DECISION & ORDER**

v.                                          15-CV-6193

CAROLYN W. COLVIN,

                    Defendant.

## Preliminary Statement

Plaintiff Mayda Alvarez brings this action pursuant to Titles II and XVI of the Social Security Act seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for a period of disability, disability insurance benefits and supplemental security income. See Complaint (Docket # 1). Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. See Docket ## 10, 18.

## Background and Procedural History

On July 20, 2012 plaintiff applied for a period of disability and disability insurance benefits, and supplemental security income. Administrative Record ("AR.") at 288-89. The claims were denied on October 30, 2012. AR. at 292-307. Plaintiff timely filed a request for a hearing before an

Administrative Law Judge ("ALJ").  AR. at 308-09.  The hearing was held on July 10, 2013, before ALJ Rosanne M. Dummer, who appeared via video teleconference from Falls Church, VA.  AR. at 219-63.  Plaintiff appeared in Rochester, NY with her attorney, Justin Goldstein.  Id.  Dian Lee Haller, a Vocational Expert, testified at the hearing.  Id.  On July 24, 2013, the ALJ issued an unfavorable decision, determining that claimant was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act.  AR. at 170-88.  Plaintiff requested review of the ALJ's decision with the Appeals Council.  AR. at 168-69. On February 2, 2015, the Appeals Council denied plaintiff's request for review, thereby adopting the ALJ's decision as the Commissioner's decision.  AR. at 1-4.  This federal lawsuit followed.  The Court heard oral argument on the competing motions on May 20, 2016.

## Medical History

On February 11, 2011, plaintiff saw Dr. John Elfar at Strong Memorial Hospital for pain, numbness and tingling in her right hand and forearm.  AR. at 1023-24.  Dr. Elfar noted that plaintiff's electromyography and nerve conduction studies were negative and that she walked with a normal gait and had a normal mood and appropriate affect.  AR. at 1023.  He reported Tinel's sign at the right hand and that plaintiff had signs and symptoms

2

consistent with carpal tunnel syndrome and some forearm pain. Id. Dr. Elfar gave plaintiff a steroid injection, which she later reported did not improve her symptoms. AR. at 1038. Plaintiff saw NP Lesley Johnson on March 25, 2011, and her physical exam was essentially normal. Id.

On June 8, 2011, plaintiff saw Dr. Tobias Kulik at Strong Internal Medicine for chronic arm pain, which she reported had been present for four years. AR. at 554-55. Plaintiff complained that the pain was so severe that it kept her up at night. AR. at 554. Dr. Kulik noted hyppallesthesia in right arm, but otherwise plaintiff's physical exam was normal. AR. at 555. Dr. Kulik remarked that plaintiff had self-discontinued therapy, and suggested she start taking Gabapentin. Id.

Between August 2011 and January 2012, plaintiff sought treatment on three occasions for back pain. AR. at 547-48, 545-46, 461-62. On August 19, 2011, plaintiff saw Dr. Michelle Spaziani complaining of progressive low back pain which had caused her to quit her job. AR. at 547. Her lower back muscles were tender to palpitation. AR. at 548. On November 15, 2011, plaintiff reported chronic back pain to NP Karen Mazza. Plaintiff had tenderness to palpitation but no spasms, full forward flexion, no radiation of her symptoms, a negative SLR test, 2+ deep tendon reflexes, full motor strength, and intact sensation. AR. at 546. Dr. Spaziani saw plaintiff again on

January 9, 2012, for complaints of back pain restricting her movement. AR. at 462. On physical examination, plaintiff's back was tender to palpation over the paraspinous muscles bilaterally in the lumbar region. AR. at 462. Plaintiff had a guarded but good range of motion on flexion, extension, lateral movement and rotation. Id. Dr. Spaziani assessed that plaintiff's pain could be somatic in nature or possibly inflammatory arthritis with a possible element of depression. Id. Plaintiff was advised to continue physical therapy and increase her Cymbalta dose. Id.

Plaintiff saw PA Amy Kallio at University of Rochester Medical Center in February and March, 2012, for knee pain resulting from a fall on ice. AR. at 464-45, 468-89, 470-71. A physical exam on March 2, 2012 revealed a somewhat depressed affect, palpable tenderness along the radial and ulnar aspect of the proximal forearm and at the medial edge of the patella, and discomfort with range of motion in plaintiff's right knee. AR. at 468. PA Kallio prescribed Paxil for plaintiff's depression. On March 26, 2012, PA Kallio's exam revealed minimal soft tissue swelling in plaintiff's right knee, and she noted that Paxil had helped improve plaintiff's depression. AR. at 470-71.

Also on March 26, 2012, PA Kallio completed a physical assessment for determination of employment. AR. at 824-827. She opined that plaintiff was unable to participate in any

4

activities other than treatment for the next six months. AR. at 824-25. PA Kallio noted that plaintiff had an abnormal gait and was unable to perform a heel and toe walk or squat. AR. at 826. She assessed plaintiff's estimated functional limitations as being "very limited" (1-2 hours in an eight hour workday) in her ability to walk, stand, sit, push, pull, bend, lift and carry. AR. at 827.

On May 10, 2012, plaintiff was treated by Dr. Gregg Nicandri and Dr. Andrew Bogle at Strong Orthopedics for knee pain. AR. at 535. Plaintiff's physical exam showed medial and lateral joint line tenderness and pes anserinus and IT band insertion tenderness, as well as medial and lateral femoral condyle tenderness. However, plaintiff had full extension and was able to flex to 110 degrees. Id. The doctors assessed that her right knee pain had unclear etiology and gave her a cortisone shot. AR. at 536.

Plaintiff saw PA Kallio on September 10, 2012 for radiating back and knee pain, right elbow joint pain, depression, lower back spasms, galactorrhea, and recurrent knee pain. AR. at 705. Plaintiff reported that her back pain was worse during the day, and became aggravated when bending, lying down, sitting, standing or twisting. AR. at 709. Plaintiff's knee pain was described as "stabbing and aching." Id. On examination, PA

Kallio noted decreased range of motion, swelling and tenderness. AR. at 709-10.

On September 29, 2012, plaintiff underwent a consultative internal medicine examination by Dr. Harbinder Toor. AR. at 557-60. Plaintiff complained of pain in her lower back, right arm and wrist, and right knee. AR. at 557. She said that she was able to cook, clean, do laundry and shop, but did not do child care, read, or socialize, and had no hobbies. AR. at 558. Dr. Toor noted on physical examination that plaintiff's gait was abnormal and she limped toward her right side. Id. She had difficulty getting out of her chair and changing for the exam, and declined to squat or perform a heel-to-toe walk. Id. Dr. Toor noted restriction in plaintiff's lumbar spine forward flexion and that plaintiff was unable to perform extension. AR. at 559. Her right elbow flexion/extension was restricted as was her forearm supination/pronation. Id. Plaintiff had tenderness in her right elbow and wrist, right knee and leg. Id. Her right wrist palmar flexion, dorsiflexion, and ulnar/radial deviation were all limited. Id. Her right knee flexion/extension was restricted. Id. Plaintiff described tingling and numbness in her right hand, and her finger dexterity was not intact. Id.

Dr. Toor diagnosed plaintiff with a history of chronic lower back pain, a history of pain in the right knee, arthritis,

history of pain in the right elbow, right lower arm, and right hand with numbness, and a history of depression. Id.  In his medical source statement, Dr. Toor opined that plaintiff had moderate to severe limitations with standing, walking, squatting, bending, lifting, sitting a long time, pushing, pulling, grasping, holding, writing, tying shoes, zipping zippers, buttoning buttons, manipulating a coin, and holding objects with the right forearm and right hand.  He further opined that pain interfered with plaintiff's balance and physical routine. Id.

Also on September 29, 2012, plaintiff underwent a consultative psychiatric evaluation with Dr. Christine Ransom at the behest of the Social Security Administration.  AR. at 561-64.  Dr. Ransom noted that plaintiff had been treated with medication for depression for the last year.  AR. at 561. Plaintiff complained of difficulty falling asleep, decreased appetite, weight loss, frequent crying spells, irritability, low energy, difficulty concentrating and having "too many thoughts in her mind at once." Id.  Plaintiff stated that she did not socialize outside of her family and avoided being around people. AR. at 562.  Dr. Ransom observed that plaintiff had lethargic motor behavior, downcast eye contact, and slow, halted, moderately dysphoric speech. Id.  Plaintiff's memory, attention, concentration, cognitive functioning, insight and

judgment were all adequate. AR. at 563. Dr. Ransom opined that plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, maintain a simple regular schedule and learn simple new tasks. Dr. Ransom stated that plaintiff would have difficulty performing complex tasks, relating adequately with others and appropriately dealing with stress. Id. She diagnosed plaintiff with major depressive disorder, currently moderate. Id.

Plaintiff followed up with Dr. Spaziani on October 8, 2012 for constant radiating back and knee pain. AR. at 565-66. Dr. Spaziani found mild effusion in plaintiff's right knee, with tenderness to palpation over the knee's medial aspect. AR. at 566. Her back was tender to palpation over the paraspinous muscles in the lumbar region and up the thoracic spine, but she did not complain of tenderness when strong pressure was applied with a stethoscope. AR. at 565-66. Plaintiff was referred to physical therapy and the pain center. AR. at 566. Dr. Martin reviewed the examination notes, commenting "chronic pain syndrome in a young woman. Certainly too young to be disabled. May need psych referral to help with depression and motivation in addition to the Pain Treatment Center and physical therapy. Agree with no narcotics." AR. at 722.

On October 26, 2012, M. Apacible, M.D., a State Agency psychiatrist, reviewed the record and concluded that plaintiff retained the ability to perform unskilled work. AR. at 273-75.

PA Kallio authored another employability assessment on November 15, 2012. AR. at 828-31. She opined that plaintiff was "very limited" (one to two hours in an eight hour day) in her ability to walk, stand, push, pull, bend, lift, and carry. AR. at 831. Plaintiff was "moderately limited" (two to four hours in an eight hour day) in her ability to sit. Id. PA Kallio concluded that plaintiff was unable to participate in activities other than treatment for six months. AR. at 829.

Plaintiff met with LMSW Lynne DeLilli at the Rochester Mental Health Center on December 11, 2012 to create an initial safety plan. AR. at 810-18. Plaintiff indicated that she was working on her tearfulness, negative thoughts, and thoughts of self-harm. Id. Plaintiff reported that she had experienced symptoms of depression and anxiety for several years and had a history of sexual assault, domestic violence, and physical abuse. AR. at 818. Plaintiff confessed to thoughts of suicide. LMSW DeLilli diagnosed plaintiff with depressive disorder. Id.

On December 18, 2012, plaintiff was examined on referral by Joel Kent, M.D. at the Pain Treatment Center at the University of Rochester Medical Center. AR. at 779-84. Plaintiff reported right arm pain, low and mid-back pain and right leg pain. AR.

at 779. Her right arm pain had begun two years prior, her back
pain dated to an injury from July 2011, and her knee pain
stemmed from a January 2012 fall. AR. at 779-80. Plaintiff
stated that her daily functioning was severely limited by her
current pain, and that she used a knee immobilizer and
occasionally crutches to walk. AR. at 780. Plaintiff told Dr.
Kent that she was unable to complete any activities of daily
living at home due to her pain and that she relied on her two
daughters to complete household chores. Id. Pain interfered
with her sleep. AR. at 782. Plaintiff described increased
stress and anxiety, though she indicated that her mood was
generally well-controlled by medication. Id. Dr. Kent's
recommendation and treatment plan detailed plaintiff's extensive
pain response and pronounced symptoms in response to what
appeared to be minor orthopedic problems and benign underlying
pathology. AR. at 784. He stated that it was likely that
psychosocial factors were negatively modulating her pain
responses, and recommended physical therapy and medication. Id.

Plaintiff saw PA Amy Kallio throughout 2013 with continued
complaints of chronic pain in her right knee, right arm and
back, and chronic diffuse pain in her upper back and neck and
upper and lower extremities. AR. at 121-22, 798-804, 972-83,
987-96, 1091. On January 28, 2013 PA Kallio noted multiple
trigger points of plaintiff's back, chest wall and upper and

10

lower extremities, and assessed probable fibromyalgia, prescribing Gabapentin. AR. at 804. Plaintiff returned on February 18, 2013 and PA Kallio slowly increased the dosage of Gabapentin, scheduling a one-month follow up for nerve conduction studies. AR. at 983. On February 20, 2013 PA Kallio drafted a letter stating that plaintiff "ha[d] a history of chronic pain, fibromyalgia, depression and anxiety," "chronic conditions" which were "not well controlled." Id. The letter concluded that plaintiff was unable to perform jury service for the next eighteen months. Plaintiff returned to PA Kallio on April 16, 2013 reporting a recent emergency room visit for increased upper and lower back pain. AR. at 995. Plaintiff's dosage of Gabapentin was again increased, and PA Kallio noted that plaintiff had an upcoming mental health appointment. AR. at 996.

On May 20, 2013, plaintiff saw Dr. Spaziani, reporting that she has been walking two miles to her mother's house several times a week in an attempt to exercise more. AR. at 1000-12. Dr. Spaziani identified multiple tender points along the paraspinous muscles and anterior trunk and extremities. She switched plaintiff from Gabapentin to Lyrica. AR. at 1012.

At a follow up on June 11, 2013, PA Kallio noted diffuse muscle tenderness, some decreased range of motion, and increased tenderness of the right knee. AR. at 121-22. In a July 22,

11

2013 employability assessment, PA Kallio opined that plaintiff
was very limited (one to two hours in an eight hour workday) in
her ability to walk, stand, push, pull, pend, use hands, or use
public transportation. AR. at 1091.[1]

Throughout 2013 plaintiff received mental health treatment,
primarily from LMSW DeLilli and NPP Amanda Lewis. AR. at 78,
79, 820, 821, 834-35, 839-41, 842, 1083-86. On January 11,
2013, plaintiff tearfully described family stress and
difficulties setting limits in relationships. AR. at 820. At a
psychiatric evaluation with NPP Lewis on February 22, 2013,
plaintiff described family stressors and ongoing depression for
the prior three years. AR. at 839. She reported social anxiety
and not wanting to be around too many people. Id. NPP Lewis
wrote that plaintiff had a significant history of trauma and
quite a few stressors, felt that she appeared to meet criteria
for major depressive disorder, and prescribed Prozac. AR. at
840. At a follow up with NPP Lewis on April 19, 2013, plaintiff
said that she did not take the Prozac and was instead back on
Paxil. AR. at 842. Plaintiff reported that she was remaining
active during the day attending her appointments, cooking,
cleaning and doing yard work. Id. Plaintiff saw NPP Lewis
again on June 12, 2013 and August 7, 2013, the notes of which

---

[1] These two reports were submitted to the Appeals Counsel only.

were consistent with prior treatment and were submitted only to the Appeals Counsel.

On June 14, 2013, LMSW DeLilli issued a psychological assessment for determination of employability. AR. at 1083-1085. She concluded that plaintiff was unable to participate in any activities except treatment for six months. AR. at 1085. She assessed that plaintiff would be very limited, i.e. unable to function 25% or more of the time, in her ability to maintain attention and concentration for rote tasks, regularly attend to a routine and maintain a schedule, and perform low stress and simple tasks. Id. Ms. DeLilli did not indicate any area in which plaintiff could function normally.

LMSW DeLilli filled out a Mental Residual Functional Capacity Questionnaire on September 26, 2013, which was sent to the Appeals Council. AR. at 156-60. She opined overall that plaintiff could not engage in full-time competitive employment on a sustained basis. AR. at 160. She wrote that plaintiff was unable to meet competitive standards in her ability to deal with stress of semiskilled or skilled work, and was seriously limited in her ability to carry out detailed instructions and set realistic goals or make plans independently of others. AR. at 159. DeLilli also described plaintiff as unable to meet competitive standards in her ability to maintain regular attendance and be punctual, work in coordination with or

13

proximity to others, complete a normal workday/week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers, respond appropriately to changes in a routine work setting, and deal with normal work stress. AR. at 158. Plaintiff's prognosis was fair.

## Hearing Testimony

Testimony of Plaintiff: On July 10, 2013, a hearing was held before ALJ Rosanne M. Dummer. Plaintiff testified that she went as far as the eleventh grade and did not have her GED. AR. at 224-25. She had previously worked as an office cleaner and as a wedding favor maker, but had to stop working because of problems with her right arm. She described swollenness and tingling in her right hand that made it difficult to grab and grasp things, and swelling in her right knee that caused it to give out. AR. at 227. Plaintiff testified that she couldn't afford the brace that was prescribed for her arm, and that she stopped using a knee brace because it gave her cramps in her sleep. AR. at 227-28. She said that she was seeking treatment for a recent diagnosis of fibromyalgia. Id.

Plaintiff stated that she could walk about a block before stopping, depending on the pain. AR. at 230. She lives with

her two teenage daughters who help her around the house. AR. at 233-34.   She also cares for her two year old grandson with special needs, though she said that she has not been able to take care of him a lot because of her pain and physical limitations.  AR. at 234.  She has trouble sleeping but is aided by medication.   Id.   Asked about her social life, plaintiff explained that she does not have a car and does not belong to any organizations, partially because she does not have much strength in her right hand.  AR. at 235.   She also said that she does not watch TV but likes listening to music.   She avoids crowds.  AR. at 238.

Testimony of the Vocational Expert:  Dian Haller, a vocational expert ("VE"), also testified at the hearing. AR. at 245-62.   The VE described plaintiff's past work as follows: (1) furniture salesperson, light work, semi-skilled, SVP of 4, DOT # 270.357-030; (2) commercial cleaner, heavy work, unskilled, SVP of 2, DOT # 381.687-014; (3) manager trainee, light work, skilled, SVP of 6, DOT # 189.167-018; (4) retail manager, light work, skilled, SVP of 7, DOT # 185.167-046; and (5) paper novelty maker, light work, unskilled, SVP of 2, DOT # 794.684-022. AR. at 248-49.

For the first hypothetical, the ALJ asked the VE to consider a person of the claimant's age, education and past work history who is able to lift and carry about twenty pounds

15

occasionally and ten pounds frequently; can sit, stand and walk about six of eight hours; can push and pull commensurate with the light level work; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; must avoid unprotected heights; is right hand dominant and can perform frequent, but not continuous or repetitive, handling and fingering with right dominant upper extremity. As for mental limitations, the ALJ included that the person is able to understand, remember, and carry out simple instructions; sustain attention for simple tasks for extended periods of two hour segments in an eight hour day; can tolerate at least brief and superficial contact with others; and is able to adapt to changes as needed for unskilled, simple work. AR. at 250-51. The VE responded that such a person would not be able to perform plaintiff's past work, but that such a person could work as an usher or lobby attendant with 55,000 jobs available nationally; a sub assembler for small electrical parts with 29,000 jobs available nationally; a housekeeper with 220,000 jobs available nationally; a parking lot attendant with 110,000 jobs available nationally; a final assembler with 140,000 jobs available nationally; an inspector, packer, and polisher of eyeglass equipment with 45,000 jobs available nationally; and a packager of small plastic products with 60,000 jobs available nationally. AR. at 252-54.

16

The ALJ then asked the VE to consider the same hypothetical person with the additional limitation of a brief sit/stand option every hour.  AR. at 254.  The VE responded that such a person could perform the previously listed jobs except parking lot attendant.  AR. at 255.  The ALJ added a further limitation that such a person could stand and walk only four of eight hours.  AR. at 256.  The VE responded that such a person could not work as an usher, lobby attendant, or housekeeper.  AR. at 256-57.

The ALJ asked if there would be an impact on the jobs identified by the VE if the hypothetical person were limited to lifting ten pounds only.  AR. at 257.  To this the VE responded that the jobs listed at the sedentary level would not be impacted.  Id.

For her final hypothetical, the ALJ asked the VE to consider an individual with very limited to no ability to have contact with other people, who may be off-task as much as twenty-five percent of the workday and may need two unscheduled breaks a day in addition to scheduled breaks.  AR. at 258.  The VE responded that such a person could not perform any jobs in the national economy.  Id.

## Determining Disability Under the Social Security Act

The Evaluation Process:   The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The determination of disability entails a five-step sequential evaluation process:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocations factors such as age, education, and work experience.
>
> 4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she

18

has residual functional capacity to perform his or her
past work.

5.   If the claimant is unable to perform his or her
past work, the Commissioner then determines whether
there is other work which the claimant could perform.
The Commissioner bears the burden of proof on this
last step, while the claimant has the burden on the
first four steps.

Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); see also 20

C.F.R. §§ 404.1520, 416.920.   Plaintiff bears the burden of

proving his case at steps one through four.   At step five, there

is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do."

Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (noting that

Commissioner "need not provide additional evidence of the

claimant's residual functional capacity" at step five); see also

20 C.F.R. § 404.1560(c)(2).

The ALJ's Decision:   In applying the five-step sequential

evaluation, the ALJ made the following determinations.   At the

first step, the ALJ found that plaintiff had not engaged in

substantial gainful activity since December 1, 2010, the alleged

onset date.   AR. at 175.   At the second step, the ALJ found that

plaintiff has the following severe impairments: major depressive

disorder, anxiety, history of drug-seeking, right elbow joint

pain medial epicondyle, right wrist tendinitis, right hand

neuropathy, knee arthritis and fibromyalgia.   AR. at 176.   At

the third step, the ALJ found that plaintiff does not have a

listed impairment which would render her disabled under the
social security listings. AR. at 176-77. Accordingly, the ALJ
moved to the fourth step, which requires asking whether
plaintiff has the residual functional capacity ("RFC") to
perform her past work, notwithstanding her severe impairments.
The ALJ concluded that plaintiff has the RFC to perform light
work, with the following limitations:

> [Plaintiff] can lift/carry about twenty pounds
> occasionally and ten pounds frequently; sit about
> six of eight hours; and stand/walk about six of
> eight hours. She can perform pushing and pulling
> commensurate with light level work. She can
> occasionally climb ramps and stairs, balance,
> stoop, kneel, crouch, and crawl. She should
> avoid unprotected heights. She is right-hand
> dominant, and she can perform frequent (not
> continuous/ repetitive) handling and fingering
> with the right dominant upper extremity.
> Secondary to mental limitations, the claimant is
> able to understand, remember, and carry out
> simple instructions. She is able to sustain
> attention for simple tasks for extended periods
> of two-hour segments in an eight-hour day. She
> is able to tolerate at least brief and
> superficial contact with others. She is able to
> adapt to changes as needed for unskilled simple
> work. She should have the option to sit or stand
> briefly on the hour, at the workstation.

AR. at 177.

Lastly, the ALJ moved to the fifth step, which is comprised
of two parts. AR. at 186-88. First, the ALJ assessed
plaintiff's job qualifications by considering her physical
ability, age, education, and previous work experience. Id. The
ALJ next determined whether jobs exist in the national economy

that a person with plaintiff's qualifications and RFC could perform. Id.; see also 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(f), 416.920(f). The ALJ found that "there are jobs that exist in significant numbers in the national economy" that plaintiff can perform, specifically usher/lobby attendant, sub-assembler of small electric parts, housekeeper, final assembler, inspector/packer/polisher of eyeglass equipment, or packager of small plastic products, pursuant to the VE's testimony. AR. at 187.

### Standard of Review

The scope of this Court's review of the ALJ's decision denying benefits to plaintiff is limited. It is not the function of the Court to determine de novo whether plaintiff is disabled. Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. Acierno v. Barnhart, 475 F.3d 77, 80—81 (2d Cir. 2007), cert. denied, 551 U.S. 1132. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Brault, 683 F.3d

at 447—48 (internal citation and quotation marks omitted).
"Even where the administrative record may also adequately
support contrary findings on particular issues, the ALJ's
factual findings must be given conclusive effect so long as they
are supported by substantial evidence." Genier v. Astrue, 606
F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

This deferential standard of review does not mean, however,
that the Court should simply "rubber stamp" the Commissioner's
determination. "Even when a claimant is represented by counsel,
it is the well-established rule in our circuit that the social
security ALJ, unlike a judge in a trial, must on behalf of all
claimants affirmatively develop the record in light of the
essentially non-adversarial nature of a benefits proceeding."
Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); see also
Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("Because a
hearing on disability benefits is a nonadversarial proceeding,
the ALJ generally has an affirmative obligation to develop the
administrative record."). While not every factual conflict in
the record need be explicitly reconciled by the ALJ, "crucial
factors in any determination must be set forth with sufficient
specificity to enable [the reviewing court] to decide whether
the determination is supported by substantial evidence."
Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984). "To
determine whether the findings are supported by substantial

22

evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983). Moreover, "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

Plaintiff challenges the ALJ's decision on the grounds that the ALJ improperly weighed medical opinions and evidence in her physical and mental RFC analysis, and argues that therefore the ALJ's decision is not supported by substantial evidence on the record. See Plaintiff's Memorandum of Law (Docket # 10-1); Plaintiff's Reply (Docket # 19). For the reasons that follow, I find that the ALJ appropriately analyzed the medical evidence of record and issued a decision that was supported by the record.

I. Plaintiff's Physical Residual Functional Capacity: At step four, the ALJ found that plaintiff retained the physical residual functional capacity to perform light work with

occasional postural limitations, frequent handling/fingering, and a brief sit/stand option on the hour. AR. at 177. Plaintiff argues that this RFC analysis is inappropriate because it does not conform to the medical opinion provided by Dr. Harbindor Toor. According to plaintiff, since Dr. Toor provided the only medical opinion related to plaintiff's physical residual functional capacity, the ALJ must "provide an overwhelmingly compelling lay justification" in order to reject Dr. Toor's opinion. See Plaintiff's Memorandum of Law (Docket # 10-1) at 34.

Dr. Toor examined plaintiff on September 29, 2012 at the behest of the Social Security Administration. AR. at 557-60. After performing a full social history, assessment of activities of daily living, and physical examination, Dr. Toor authored a medical source statement describing plaintiff as having moderate to severe limitations standing, walking, squatting, bending, and lifting; moderate limitations sitting for a long time and stating that pain would interfere with her balance and physical routine; and moderate limitations pushing, pulling, grasping, holding, writing, tying shoes, zipping zippers, buttoning buttons, manipulating a coin, or holding objects with the right forearm and right hand. AR. at 560. The ALJ rejected Dr. Toor's assessment of plaintiff's moderate to severe limitations as inconsistent with the overall evidence, explaining that "Dr.

24

Toor's opinion appears to be based on the claimant's self-reports and is entitled to little weight." AR. at 184.

Plaintiff contends that the ALJ erred by using her own lay opinion to discount Dr. Toor's opinion. Plaintiff also argues that it was inappropriate for the ALJ to reject plaintiff's subjective assessments of pain because she is diagnosed with fibromyalgia, a recognized disorder which is identified primarily through subjective experiences of pain rather than objective medical findings. See Plaintiff's Memorandum (Docket # 10-1) at 36-37; Plaintiff's Reply (Docket # 19) at 3.

As a one-time consultative examiner, Dr. Toor is not entitled to the same deference as a treating physician. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (explaining that treating physician's opinions are generally given "controlling weight"). Indeed, this Circuit has found that a consulting physician's opinion or report should generally be given little weight if it conflicts with other opinions of record. See Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990); see also Camille v. Colvin, 104 F. Supp. 3d 329, 343 (W.D.N.Y. 2015).[2] Citing Giddings v. Astrue, 333 F. App'x. 649, 652 (2d Cir. 2009), plaintiff argues that the ALJ was required to

---

[2]Of course, in some circumstances, a consultative examiner's opinion may constitute substantial evidence to support an ALJ's decision, provided it is supported by evidence on the record. See Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995).

provide an "overwhelmingly compelling justification" for discounting Dr. Toor's opinion. See Plaintiff's Memorandum (Docket # 10-1) at 35. I respectfully disagree. In Giddings, the Second Circuit remanded a disability case back to the district court, finding in part that the ALJ's rejection of a one-time examiner's opinion was unsupported by the record. Important to the Second Circuit was the fact that the one-time examiner's opinion was "the *only* medical opinion" explicitly addressing the effects of plaintiff's impairments on her ability to work and because the ALJ "did not refer to *any* medical opinion that contradicted the [consultative] opinion." Giddings, 333 F. App'x at 652 (emphases in original). Based on the foregoing, the court found that "when a medical opinion stands uncontradicted, '[a] circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling . . . .'" Id. at 652 (quoting Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (additional internal quotation marks omitted)).

The instant case stands in contrast to Giddings. Though plaintiff criticizes the ALJ for discounting Dr. Toor's opinion, that opinion is but one piece of a voluminous medical history and record. Moreover, in her decision, ALJ Dummer cited several medical opinions and other record evidence that supported her RFC determination, whereas the ALJ in Giddings cited none. For

example, ALJ Dummer pointed specifically to an examination from an emergency room visit on November 15, 2011, in which no acute findings on exam were noted, AR. at 546, an MRI of plaintiff's right knee from February 24, 2012 that Dr. Gregory Diedonne noted was "essentially unremarkable," AR. at 467, and a November 30, 2012 x-ray of plaintiff's right knee that did not show any obvious abnormalities, AR. at 945. AR. at 184. ALJ Dummer referenced plaintiff's treating physicians who questioned plaintiff's self-reports of pain, pointing out that Dr. Carroll noted "pain is out of proportion to the clinical findings," and Dr. Martin wrote "may need psych referral to help with depression and motivation in addition to the pain clinic and PT." AR. at 184, 534, 919. ALJ Dummer also relied upon plaintiff's own statement that she had been walking two miles several times a week in an effort to increase her exercise. AR. at 184, 1011. These objective medical findings, medical opinions, and plaintiff's own subjective reporting certainly contrast Dr. Toor's single consultative opinion that plaintiff had moderate to severe limitations with standing and walking and moderate limitations with sitting for a long time.

Evidence cited elsewhere in the ALJ's opinion and in the record provides evidentiary support for the ALJ's RFC finding that plaintiff could sit stand and walk six of eight hours a day with brief hourly intervals. Plaintiff's own treating

27

physician, Dr. Michelle Spaziani assessed on January 9, 2012 that plaintiff's back pain and various aches and pains could be somatic in nature. AR. at 462. Dr. Spaziani wrote on October 9, 2012 that patient had "no medical problems aside from depression." AR. at 566. In June 2012, Dr. Bogle stated that plaintiff had full range of motion and the ability to toe and heel walk without difficulty. AR. at 534, 536. A report from plaintiff's physical therapist Joe Griseta in May 2013 states that plaintiff had full and active range of motion in her extremities and that her lower extremity strength was within functional limits. AR. at 858. PT Griseta's report was final because plaintiff was discharged from physical therapy, stating that "all goals achieved and patient independent with a home exercise program." Id.

Plaintiff received generally conservative treatment and her healthcare providers repeatedly avoided recommending surgery. She was instead referred to physical therapy, told to use wrist splints, medication, steroid injections, back exercises, knee immobilizer, and ice. AR. at 123, 182, 460, 462, 512, 534, 536, 546, 555-56, 578, 615-16, 757, 766-67, 784, 798, 804, 844, 1023, 1038. Several times it appears that plaintiff was referred to physical therapy but did not go, or went but then stopped attending. Conservative treatment may be taken into account "as

additional evidence supporting the ALJ's determination." Netter
v. Astrue, 272 F. App'x 54, 55 (2d Cir. 2008).

Plaintiff's counsel highlights, and the Court recognizes
that plaintiff has been diagnosed with fibromyalgia, which is
characterized by a noted absence of objective abnormality on x-
rays and other laboratory tests.   See Plaintiff's Memorandum
(Docket # 10-1) at 36-37; see also Green-Younger v. Barnhart,
335 F.3d 99, 107 (2d Cir. 2003) (recognizing fibromyalgia as a
disabling impairment).     Fibromyalgia is diagnosed by the
presence of multiple tender points, which were present in many
of plaintiff's medical examination.   However to the extent that
plaintiff argues that her fibromyalgia requires a finding of
disability, I respectfully disagree.   The ALJ noted plaintiff's
fibromyalgia diagnosis, referenced it many times throughout the
opinion, and accounted for plaintiff's physical restrictions due
to pain in the RFC.    AR. at 176-85.    Unlike in Green-Younger
where the ALJ failed to credit a physician's findings related to
the disease, in this case, the ALJ accepted the diagnosis but
based on the totality of the record did not find it disabling.
In self-reports, plaintiff stated that she is able to manage
money, ride a bus, cook, clean, shop, and launder clothes.   AR.
at 563.    She stated that she walked about two miles to her
mother's home several times a week.    AR. at 858, 1011.
Plaintiff described caring for her mother, grandson with special

29

needs and other family members. AR. at 78-79, 782, 839. Caring for a young child is consistent with the ability to perform light work. See Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009); see also Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (determining that plaintiff was capable of performing light work wherein the ALJ properly considered plaintiff's ability to remain active, and engage in an exercise regimen despite having fibromyalgia). There is substantial evidence in the record supporting the ALJ's physical RFC finding, and I find no error.

II. The ALJ's Mental RFC: ALJ Dummer found plaintiff capable of performing simple, unskilled work with brief and superficial contact with others. AR. at 177. To support this assessment, she cited opinions from Dr. Apacible and Dr. Ransom, along with other treating opinions and medical findings on the record. Plaintiff argues that the ALJ erred in relying on the opinions of Dr. Ransom, a psychiatric consultative examiner who met with plaintiff once, and Dr. Apacible, a reviewing physician who never met plaintiff. Both opinions found that plaintiff could perform unskilled work on a sustained basis, AR. at 273-74, 563, and the ALJ gave "great weight" to Dr. Apacible's opinion and found Dr. Ransom's opinion to be "not contradicted by the" RFC. AR. at 184-85. Plaintiff argues that Dr. Apacible's opinion was rendered prior to other notable mental

health opinions and therefore was made on an incomplete record
and cannot amount to substantial evidence. See Pratts v.
Chater, 94 F.3d 34, 36 (2d Cir. 1996)(a medical opinion rendered
on an incomplete record does not constitute substantial
evidence). As to Dr. Ransom's opinion, plaintiff argues that it
is too vague to be the basis of substantial evidence for the RFC
analysis. In place of these opinions, plaintiff argues, the ALJ
should have afforded greater weight to the two opinions from
plaintiff's treating therapist, LMSW Lynne DeLilli, who found
that plaintiff had disabling mental health limitations and was
unable to work. AR. at 156-60, 1083-86. I find plaintiff's
arguments unpersuasive, and find that the record as a whole
supports the ALJ's RFC analysis.

After examining plaintiff on September 29, 2012,
consultative examiner Dr. Christine Ransom wrote that plaintiff
could

> follow and understand simple directions and
> instructions, perform simple tasks
> independently, maintain attention and
> concentration for simple tasks, maintain a
> simple regular schedule and learn simple new
> tasks. She will have moderate difficulty
> performing complex tasks, relat[ing]
> adequately with others and appropriately
> deal[ing] with stress due to major
> depressive disorder, currently moderate.

AR. at 563. One month later, based on a review of the entire
record to date, state agency reviewing physician Dr. Apacible

opined that plaintiff "retains ability to perform unskilled work on sustained basis." AR. at 274.

Plaintiff began seeking mental health treatment in December 2012, and saw LMSW Lynne DeLilli and NPP Amanda Lewis for ongoing care. In support of her decision, the ALJ noted that Ms. Lewis scheduled follow ups with plaintiff averaging every six to eight weeks, indicating no "debilitating mental impairments nor that the claimant's physical health issues required such extreme restriction." AR. at 185 (referencing AR. at 836, 840, 843). NPP Lewis' treatment notes indicate that plaintiff has various psychosocial stressors and that the therapy sessions focused on helping plaintiff manage these stressors. AR. at 840, 842. In January 2013, LMSW DeLilli noted that plaintiff was cooperative, had good eye contact, exhibited appropriate behavior, had calm motor activity, appropriate speech, logical thought processes, goal-directed thought content, no hallucinations, appropriate judgment, and intact long term memory. AR. at 820-21. LMSW DeLilli authored two assessments for employment, one on June 14, 2012 and the other on September 26, 2013, opining that plaintiff could not engage in full-time competitive employment. AR. at 156-60, 1083-85.

The ALJ was under no duty to afford great weight to either LMSW DeLilli or NPP Lewis because they are not acceptable

medical sources. See 20 C.F.R. § 416.913(d)(1)(listing therapists as "other sources"). Here, the ALJ explained that she granted little weight to LMSW DeLilli's opinions in part because they were inconsistent with the treatment record from NPP Lewis, and with the record as a whole. AR. at 185. Such an explanation satisfies her duty under the regulations, and satisfies this Court. Further, it is well-settled that a "treating physician's statement that the claimant is disabled cannot itself be determinative." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)). LMSW's DeLilli's opinions that plaintiff was disabled were not entitled to any particular deference because the Commissioner makes the ultimate determination on the issue of disability. See, e.g., Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003) (establishing that treating physician's opinions as to the issue of disability is not given any weight)(citing 20 C.F.R. § 404.1527(e)(1); Snell, 177 F.3d at 133). Overall, it was well within the ALJ's discretion to place greater weight on the findings and relatively minimal treatment of NPP Lewis than on the opinions of LMSW DeLilli, and no error is found. See Netter v. Astrue, 272 F. App'x 54, 55 (2d Cir. 2008) (finding no error "because the district court relied on Dr. Regalla's conservative treatment regimen merely as additional evidence supporting the

33

ALJ's determination rather than as "compelling" evidence sufficient in itself to overcome an "otherwise valid medical opinion").

Despite plaintiff's urging, the Court does not find that Dr. Ransom's statements regarding plaintiff's mental limitations are overly vague. See Plaintiff's Memorandum of Law (Docket # 10-1) at 42-43; Plaintiff's Reply (Docket # 19) at 3-4. Dr. Ransom opined that plaintiff had moderate difficulty performing complex tasks, relating adequately with others and dealing appropriately with stress. AR. at 563. The ALJ read this opinion in congruence with the other mental health treatment records, and limited plaintiff's RFC to simple work with brief and superficial contact with others. AR. at 177. ALJ Dummer noted that Dr. Ransom's opinion was "not work precluding and [] not contradicted by the [RFC]." AR. at 184. Plaintiff's reliance on Curry v. Apfel, 209 F.3d 117, 123-24 (2d Cir. 2000) is misplaced. In Curry, the Second Circuit made a point to explain that "the terms 'moderate' and 'mild,' without additional information, do[] not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference[s]" about plaintiff's functional capacity. Id. at 123 (emphasis added). Here, Dr. Ransom's assessment of plaintiff's moderate limitations was not the only opinion relied on in ALJ Dummer's

RFC analysis.  As discussed above, she possessed a substantial medical history with medical opinions dating back to 2010, as well as the notes from mental health providers NPP Lewis and LMSW DeLilli in 2013.  The ALJ was able to assess Dr. Ransom's opinion in light of all of the other evidence.  See Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (upholding an ALJ's mental RFC analysis that was based on clinical findings that plaintiff had no more than "mild" or "moderate" limitations).

Finally, the Court disagrees that the ALJ erred in applying great weight to Dr. Apacible's opinion from October 26, 2012, which stated that plaintiff retained the ability to perform unskilled work on a sustained basis.  AR. at 185, 274. Plaintiff argues that because Dr. Apacible based his opinion off of an incomplete record, it cannot amount to substantial evidence.  See Plaintiff's Memorandum of Law (Docket # 10-1) at 41-42; see Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (finding that a non-examining, non-consultative opinion made off of an incomplete record does not form the basis for substantial evidence).  It is true that Dr. Apacible did not have the benefit of viewing treatment notes dated after he rendered his opinion, including LMSW DeLilli's assessments and NPP Lewis' opinions.  That fact, however, does not invalidate his opinion.

Dr. Apacible had the benefit of examining the records predating his assessment, including Dr. Ransom's findings, AR.

at 561-64, Dr. Elfar's notes from February 11, 2011 describing plaintiff's mood and affect as normal and appropriate, AR. at 1023, NP Johnson's findings from April 6, 2011 noting a stable affect, AR. at 556, and Dr. Spaziani's opinions in January 2012 noting that plaintiff's depression was stable on Cymbalta and that her mood and interest in activities was good, AR. at 461. PA Lauren Owens wrote in March 2012 that plaintiff had normal mood, affect, behavior, judgment and thought content. AR. at 475. PA Kelly Romanofsky affirmed those findings in April, 2012. AR. at 497. Dr. Davis also found that plaintiff's affect, mood, behavior, and thought content were normal in October 2012. AR. at 625. In short, Dr. Apacible's opinion was based off of a sufficient medical record and the ALJ did not err in relying on his opinion. See Tankisi v. Comm'r of Soc. Sec., 521 Fed.Appx. 29, 35 (2d Cir. 2013) (finding no error in granting "substantial weight" to a non-examining opinion that was supported by the remainder of the record and post-dated examinations, with no suggestion of later deterioration). To be sure, plaintiff articulates strong disagreement with the ALJ's weighing of the evidence, but the deferential standard of review precludes the Court from re-weighing it. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012).

In conclusion, the ALJ sufficiently assessed the evidence of record in making her RFC analysis and there is substantial evidence supporting her finding of non-disability.

## Conclusion

For the reasons discussed above, this Court finds that the ALJ's decision was supported by substantial evidence in the record. Therefore, Commissioner's motion for judgment on the pleadings (Docket # 18) is **granted**, and plaintiff's motion for judgment on the pleadings (Docket # 10) is **denied**.

SO ORDERED.

JONATHAN W. FELDMAN
United States Magistrate Judge

Dated:    September 30, 2016
          Rochester, New York